## J. S. NORMAN v. EAST CAROLINA RAILWAY COMPANY.

### (Filed 5 March, 1913.)

1. **Carriers of Passengers—Tickets—Receipts—Presumptions—Evidence.**

   A railroad ticket is in the nature of a receipt to the passenger for his railroad fare to his destination, and is evidence to the proper agents of the company that the bearer is entitled to be carried by the company issuing it.

2. **Same—Contracts—Consideration.**

   Where a passenger of a railroad company purchases from its ticket agent at its station the usual ticket to his destination, the ticket is *prima facie* evidence that the holder has paid the consideration or the regular price for it, which entitled him to be accordingly transported by the company.

3. **Carriers of Passengers—Tickets—Stipulations—Notice—Consent —Contracts—Consideration.**

   The purchaser of a ticket of a railroad company by paying the usual charges therefor in the usual way is entitled to have a valid ticket given him by the company's agent, and, in the absence of evidence of his assent prior to or at the time of the purchase, he is not bound by a stipulation on the ticket rendering it invalid, for such provision would be without consideration.

4. **Same—Station Stamp—Unreasonable Rules.**

   A ticket of a railroad company, reading "Station stamped on back, to station opposite point in margin below; good for one passage, etc.," does not notify the purchaser or indicate to him that he is entering into a contract that would invalidate the ticket if the station where he purchased it was not stamped on the back thereof; and such requirement not appearing upon the face of the ticket, or brought to the purchaser's notice, or assented to by him. is unreasonable, and will not bind him.

5. **Same—Principal and Agent—Negligence—Respondeat Superior.**

   Where the ticket agent of a railroad company has failed to stamp his station on the back of a ticket furnished by him to a passenger at the regular price therefor, and the conductor wrongfully ejects the passenger from the train under a rule of the company requiring it, under the circumstances, the company is liable to the passenger for the injury thereby caused, arising from the negligence of its station agent, while the conductor may be exonerated from personal blame.

6. **Carriers of Passengers—Wrongful Ejection of Passenger—Avoidance of Damages—Cash Fare—Instructions—Evidence.**

. The plaintiff sues for damages sustained by him for being wrongfully ejected from defendant railroad company's passenger train by the conductor, who refused to recognize the validity of a ticket good for transporting the plaintiff to his destination. The defendant contended that the plaintiff, after he had been ejected, should have avoided the damages incurred by paying in cash the railroad fare to his destination, and tendered a prayer for special instruction to that effect: *Held*, the prayer was properly refused, for it assumed that the plaintiff had the money to pay the cash fare, of which there was no evidence.

7. **Carriers of Passengers — Ejection of Passenger — Right to Pay Cash Fare—Rights of Conductor—Waiver—Evidence—Instructions.**

When the conductor on a railroad company's passenger train erroneously assumes that a ticket, good for a passenger's transportation, is invalid, and ejects him from the train, a prayer for instruction which assumes that the conductor would then have accepted a cash fare, and that the plaintiff should have paid so as to have avoided the damages caused by the ejection, is properly refused; for the conductor from his point of view was under no legal obligation to accept the fare after the passenger's expulsion, the latter having at that time forfeited his right by his misconduct, and there being no evidence that the conductor would have waived his right to refuse had the cash fare been tendered him.

APPEAL by defendant from *Cline, J.*, at September Term, 1912, of PITT.

This action is to recover damages for the wrongful expulsion of the plaintiff from the defendant's train.

The plaintiff testified in his own behalf as follows: "On Monday morning, the 19th of June, I went to Tarboro. There I went to the station of the East Carolina Railway. Mr. Eason and his wife were there in the station. They bought their tickets to Macclesfield. I bought a ticket for Macclesfield. When the agent gave me the ticket he handed me a nickel. I said, 'Here, I want a ticket to Pinetops,' and I gave him back the nickel. Then he gave me my ticket and 10 cents back. I gave him 50 cents and got back 15 cents. The agent sold me the ticket. I suppose in about ten minutes the train left—maybe

NORMAN *v.* R. R.

fifteen.  When the conductor came through to take up the tickets I handed him my ticket.  He looked at the ticket and said, 'This ticket is no good.'  I said, 'I can't account for that. I bought it this morning and paid for it.'  He said, 'It is not stamped.'  I said, 'That is the fault of the agent, and not mine.' He said, 'I cannot accept that ticket for a passage in its present condition.'  I said, 'Well, the fault is with the agent, and not mine.'  Mr. Eason spoke up and said, 'I saw the gentleman buy the ticket.  I know he is entitled to a passage on that ticket, because he bought it and paid for it.'  The conductor said he could not accept it, as he had been ordered by the superintendent of the company not to accept any ticket that was not stamped. I said, 'I haven't broken any rules of the company; that is a matter for you to take up with the company.'  He said he couldn't accept it, and I would have to pay my cash fare.  I said I bought and paid for a ticket, and I was not going to pay for another fare.  He said I would have to pay for it or get off the train.  I said that is up to you whether you carry me.  The train ran about a mile probably, and he came back.  He came in and said he must have the fare or 'you will have to get off the train.'  I said all right.  He stopped the train.  I took my baggage and got off the train.  When I got on the ground I said, 'This is all foolishness for you to put me off, and if you carry me there will be no damage, but if you do not, you and your company are going to get into trouble.'  There were no passengers to get off or on.  They just stopped to put me off. There was nobody living there.  I didn't see any one.  I looked around to see if I could get a team.  I met a section man.  He was working the road between Henrietta and Davidstown, and I asked him if he knew where I could get a team.  He said no, and I walked to Davidstown (a nigger town) and couldn't get a team there, so I had to walk to Pinetops.  I got there about 20 or 25 minutes past 2; that was about 7 miles.  I was confined to my bed in the house for three weeks before that, and in the house about four weeks.  I had started out that Monday morning.  I had not been out before.  I had been suffering from rheumatism for about seven or eight weeks, and this day I had

to walk this distance was as hot a day as any day in summer.
I was humiliated before the other passengers by being put off
the train. I was worried and vexed, and when I arrived at
Pinetops I was wet with perspiration—as wet as water could
make a man. I did not have a dry cloth on me. I was not able
to do any work that day. I didn't even scratch my order book.
I didn't take any order that day. I was not in a condition to
take an order. I came home that night and did not go out
again for two days. I couldn't go out, I was so sore, and I
practically lost a week's business. I had mapped out Pinetops
and Macclesfield and was to take the next train back to Rocky
Mount that night; but instead of going there, I had to take the
train to Farmville that night and get a late train home."

There was other evidence corroborating the plaintiff.

The ticket was paid for at the regular fare and contained the
following printed matter on the face of it:

### EAST CAROLINA RAILWAY.

Station stamped on back, to station opposite point in margin
below.

Good for one passage, if used on or before midnight of date
canceled by "L" punch in margin, only on trains stopping at
destination. Void if it shows any alterations, erasures, or is
mutilated in any manner, or if B. C. punch is in any other than
place designated. If more than one date, destination, or class
is canceled, it will only be accepted within the shortest limit, to
the shortest destination, for the lowest class canceled. If
"Clergy," it will be good only when accompanied by clergy per-
mit. Baggage liability limited to wearing apparel not exceed-
ing $100 in value.                          HAYWOOD FOXHALL,
                                       *General Passenger Agent.*

It showed plainly the point of destination, and the only de-
fect claimed was that the agent failed to stamp on the back of
it the station at which it was issued.

The defendant introduced no evidence.

The defendant moved for judgment of nonsuit, which was re-
fused, and the defendant excepted.

The defendant tendered an issue on contributory negligence, which was refused, and the defendant excepted.

The defendant requested that the following instruction be given to the jury: "If you find the fact to be that at the time the plaintiff was in bad physical condition, and that by reason of that condition the walk to Pinetops caused him bodily suffering, he would not be entitled to recover any damage for this, because the law does not permit a person, when he has been wronged by another, to do an act that would aggravate and add to that wrong. The plaintiff knowing his bad physical condition, should not have subjected himself to the ordeal of a walk to Pinetops. He should, after being put off the train, have tendered the fare of 35 cents demanded by the conductor and avoided and saved himself the suffering that he knew would be caused by the walk to Pinetops; so you are instructed not to allow any damage at all for any suffering caused the plaintiff by the walk to Pinetops."

The court refused to so instruct, and the defendant excepted.

His Honor did instruct the jury on this question as follows:

"If he was put off the train, then they (the company) might have been at fault in putting him off the train; but the plaintiff would have the burden of exercising due care to save himself from physical exhaustion and suffering or injury in walking the distance he said he had to walk in order to get to his destination; whether he did not do all that he could in trying to get a conveyance to his destination is a question for you; he says he did try, but could find no means of conveyance, and therefore had to walk the entire distance of 6 or 7 miles. If you find he used due diligence in endeavoring to get a conveyance or other means to reach his destination, then he could recover of the defendant for whatever physical discomfort or suffering he sustained. If you find he failed to do so, then he cannot recover for any physical suffering."

There was a verdict and judgment in favor of the plaintiff, and the defendant excepted and appealed.

*F. G. James & Son for plaintiff.*
*J. L. Bridgers for defendant.*

ALLEN, J.  The plaintiff paid the usual and customary fare for his ticket, and was granted no right or privilege in consideration of a reduced rate.

Under these circumstances, the ticket was in the nature of a receipt for the passage money, and its office was to furnish evidence to the agents of the company that the bearer was entitled to be carried.

It was. *prima facie* evidence that the holder had paid the regular price for it, and had the right to be transported, and was evidence of an agreement on the part of the defendant to carry him to his destination for a consideration paid.  1 Fet. Cor., sec. 275; *Boyd v. Spencer*, 103 Ga., 146.

The plaintiff performed his part of the contract and was entitled to a valid ticket, and in the absence of evidence of assent on his part prior to or at the time of the purchase, was not bound by a stipulation rendering the ticket invalid, as there was no consideration to support the stipulation.

The Supreme Court of Tennessee, speaking of this question in *R. R. v. Turner*, 100 Tenn., 223, says: "We are also of opinion that the mere stamping or printing of a limitation or condition upon the back or face of a ticket, and the acceptance of such ticket by a passenger, without more, is not sufficient to bind him to such condition or limitation, in the absence of actual notice to him of such condition or limitation and his assent thereto when he purchases the ticket.  It cannot be presumed that every person buying a railroad ticket, for ordinary and general use, will, in the hurry and bustle of travel, stop to read and critically inspect his ticket.  As a matter of fact, but little opportunity is afforded him to do so.  He generally takes his place in the crowd at the ticket window, produces and hands over his money with a request for a ticket to destination. His money is received.  The ticket is produced, and, after being stamped, is handed to him through the ticket window.  He has had no opportunity to see what is upon it, and has no time, in the rush, to stop and read and consider what may be printed or stamped on its face or back, and when he has paid full fare there is no occasion for his doing so, inasmuch as he can safely

rely upon the contract which the law makes for him. Ordinarily local tickets do not generally contain any terms of contract, and are not intended to do so. They are mere tokens to the passenger and vouchers for the conductor, adopted for convenience to show that the passenger has paid his fare from one place to another, very much in the nature of baggage checks. The contract is in fact made when the ticket is purchased, and if it is different from what the law would imply, it must be so stated and assented to when the ticket is delivered. . . . This rule, which we consider to be settled by the weight of authority and by reason, by no means prevents a railroad company from selling special tickets for special trains with limitations and conditions, such as excursion, round-trip, commutation, and mileage tickets, when the conditions and limitations are known to the purchaser and assented to by him orally or in writing, and he has paid for such ticket less than the usual fare. When tickets are sold at reduced rates, it has been very wisely said that the purchaser should, in consideration of such reduced fare or greater privileges, expect and look for some conditions, limitations, and terms different from those attaching to tickets generally, and be on his guard to become informed of them. But there is no such obligation upon the ordinary passenger, who pays the usual or full fare and asks for no reduced rates or special privileges, and he has a right to expect an unlimited ticket."

We quote at length from the opinion because the rule with its limitation is stated clearly and accurately.

Nor was there anything on the ticket to notify the plaintiff or to indicate to him that he was entering into a contract by which the ticket delivered to him would be invalid if the station at which it was issued was not stamped on the back, and while common carriers may make reasonable rules and regulations, they cannot bind persons dealing with them by special contracts of which they have no notice, and not contained in the writing.

In construing contracts of this kind, "language of uncertain or doubtful meaning should generally be taken in its strongest sense against the company by which the ticket was issued and

sold, and in favor of the purchaser. This rule of construction is in accord with common sense. It may be supposed that one who himself writes or prepares a written contract in which he is interested will be sure to use language which he conceives is best adapted to secure to himself the full benefit of everything he could claim under the agreement the writing is intended to evidence. It is therefore allowable and just, at the instance of the opposite party, to scan critically the phraseology employed. This is obviously right for the additional reason that as the purchaser had nothing whatever to do with preparing the ticket, and had no voice in the wording of it, it was his right to claim under it the benefit of the strongest interpretation which could be made in his favor." 1 Fet. Cor., sec. 276.

The ticket does not say it will be void if the station is not stamped on the back, nor is there anything to suggest that there was any obligation on the plaintiff except to present it; and as it was evidence that the regular fare had been paid, and required no identification of the purchaser, we fail to see how the defendant could have suffered loss by accepting it. Indeed, so far as we are advised, from the evidence, the only useful purpose that could be served by stamping on the back is to enable the defendant to check up its agents.

If, however, the statement on the ticket is contractual and is equivalent to a stipulation that the ticket will be invalid unless the station at which it was issued is stamped on the back, there is no evidence that the plaintiff had notice of such requirement, and as he paid for a valid ticket, he had the right to assume that the agent had given him what he had paid for. Wood Railways, vol. 3, sec. 349; *R. R. v. Turner,* 100 Tenn., 223; *Head v. R. R.,* 79 Ga., 358; *R. R. v. Dougherty,* 86 Ga., 744; *Ellsworth v. R. R.,* 95 Iowa, 107.

The authorities cited fully support the text in section 349 of vol. 1 of Wood on Railways, from which we quote: "Where the passenger asks and pays for a certain ticket, and the station agent by mistake gives him a different one, which does not entitle him to the passage desired, the conductor has no right to expel him, and the company is liable in damages if he is

expelled. The passenger has a right to rely on the agent to give him the right ticket. There are authorities which hold the other way, but it seems that their views are indefensible. It is true, the conductor may have no possible means of knowing the facts of the case except through the passenger's statement, which is liable to be prejudiced or untruthful, but there is no reason why the company may not be made to respond in damages on the ground that the expulsion was the proximate consequence of the wrongful act of its agent who sold the ticket."

There is some conflict of opinion as to the liability of a carrier for ejecting a passenger on account of the mistake of the ticket agent, when the conductor is obeying a rule of the company, as shown by the full and comprehensive note to *Shelton v. R. R.*, 9 A. and E. Ann. Cases, 889, some of the courts holding that the face of the ticket presented by the passenger is conclusive, and that if the ticket does not entitle the passenger to be on the train he must pay his fare or submit to ejection, but we think the weight of authority and the better opinion is that, although the conductor has followed the regulations of the company and may be exonerated from blame personally, if the company, through its ticket agent, has done that which has caused the injury, the company is liable. Wood on Railways, vol. 3, sec. 349; *R. R. v. Dougherty*, 86 Ga., 744; *Ellsworth v. R. R.*, 95 Iowa, 107; *Yorton v. R. R.*, 62 Wis., 370; *Trice v. R. R.*, 40 W. Va., 273; *R. R. v. Grimes*, 99 Ky., 411; *Heard v. R. R.*, 79 Ga., 358.

In the *Dougherty case* the facts were in all material respects like those in the case before us. The plaintiff demanded and paid for a ticket to Atlanta, and the agent gave her a ticket to Asheville, and she was ejected. The Court says: "We think, under these circumstances, she had a right to recover damages from the railroad company. We think she had a right to rely upon the ticket she had purchased from the agent of the railroad company as being a proper one, without an examination of the same; and nothing else appearing, there being no intervening circumstances which required her to look at the ticket, if she could have read the same, such conduct upon the part of the railway company and its agents authorized her to recover dam-

ages," and further in the same case, quoting from *Hufford v. R. R.*, 31 N. W. R., 544: "Where a passenger who has purchased a ticket of the authorized agent of a railroad company, believing in good faith that it is genuine, and issued by the company, and such as the agent had a right to sell, states such facts to the conductor of the train, such conductor is bound to take such facts as true until the contrary is proven, without regard to any words, figures, or other marks on the ticket."

The language first quoted from the Georgia case is expressly approved in the Iowa case, and the other cases cited sustain fully the same doctrine. The principle upon which *Mace v. R. R.*, 151 N. C., 404; *Harvey v. R. R.*, 153 N. C., 567, and *Dorsett v. R. R.*, 156 N. C., 439, were decided is the same, as in each the railroad was held liable in damages for expelling a passenger, brought about by the mistake of the agent, although the conductor was obeying a rule of the company.

If we apply these principles to the evidence, it follows necessarily that there was no error in refusing to enter judgment of nonsuit, and that there was no evidence of contributory negligence, as it appears that the plaintiff demanded and paid for a ticket at the regular fare; that he had no notice of any stipulation that might invalidate it, and that he was ejected from the defendant's train because of the mistake of its agent.

We might dispose of the defendant's special prayer for instruction upon the technical ground that it assumes that the plaintiff had 35 cents, when there is no evidence that he had more than 15 cents, but we prefer to consider the more important question presented.

The contention of the defendant is that if it be admitted that the plaintiff was wrongfully ejected from the train, the tort was complete when the plaintiff reached the ground, and that it was then only a question of damages, which it was the duty of plaintiff to decrease. The defendant has furnished us with no authority in support of this view, but while not directly in point, the trend of the decisions in *R. R. v. Arnold*, 8 Ind. App., 300; *Yorton v. R. R.*, 62 Wis., 370, and *Harvey v. R. R., supra*, is against it.

In the *Arnold* case the Court says: "We do not concur in the doctrine that it was the duty of the appellee to pay the extra fare demanded of him and afterwards settle the question in dispute with the company or its agents. It is true that the amount demanded was trifling, but the principle involved is the same as if the sum demanded had been a large one. . . . Appellant chose to stand upon what it conceived to be its strict legal rights. It cannot now be heard to complain if the appellee chose to do the same. It comes with an ill grace for the appellant, after it has pushed what it believed to be its rights to the last extremity, to say that because it offered to carry appellee if he would pay his fare, the damages ought to be mitigated. Appellee was under no legal obligation to accept any offer, no matter how considerately made. In fact, the offer itself was only what the appellant would have been compelled to give to any person who would pay the fare demanded. The time to be magnanimous was before the expulsion occurred. Appellant cannot excuse or palliate the wrong or mitigate the damages flowing therefrom by its subsequent acts."

If, however, the position is sound, the instruction was properly refused, because it is assumed that the conductor would have accepted a tender of fare after the expulsion, and there is no evidence of this fact. The conductor was acting upon the assumption that the ticket was invalid, and that he had the right to eject the plaintiff. If so, it was his duty to accept the fare before expulsion, but was under no legal obligation to do so afterwards. *Clark v. R. R.,* 91 N. C., 512; *Pickens v. R. R.,* 104 N. C., 325.

The Court says in the *Clark* case: "Nor when the officer has stopped the train and he is descending the steps and is about to pass out, will a tender of the fare entitle him to return to his seat. He forfeits his right of carriage by such misconduct, by breaking his own contract to pay, when called on, and it is not regained by his repentance at the last moment and after he has caused the inconvenience and delay to the company by his wrongful act"; and in the *Pickens* case: "If the tender of fare is made by a passenger or any other person for him before the train is stopped to expel him, the company must accept it and allow

GREENVILLE *v.* GORNTO.

him to remain; but after the train has been stopped for that purpose, he cannot reimpose upon the company the obligation to perform a contract which he had violated in the first instance, by an offer of the money that he ought to have paid when demanded."

Upon the facts as they appeared to the conductor, he had the right to eject the plaintiff, and the plaintiff had lost his right to tender fare, and there is no suggestion that the conductor then offered to allow him to pay fare and return to the train after he was ejected, nor was there any reason for the plaintiff to believe that the conductor, who had so recently exacted a compliance with the letter of the law, as against him, would waive his legal rights as he conceived them, in his behalf.

There are other exceptions in the record, which we have examined, and which it is not necessary to discuss.

We find

No error.